UNITED STATES BANKRUPTCY COURT
Northern District of Alabama, Eastern Division

IN RE: )
)
BOBBY EDWIN GARRARD and )
JUDY WALKER GARRARD, ) Case No. 13-40418-JJR13
)
    Debtors. )

IN RE: )
)
CHRISTOPHER LEE STRACENER, ) Case No. 13-40419-JJR13
)
    Debtor. )

# OPINION

## I: Background

Although these two cases were previously dismissed, in order to appreciate the issues addressed in this opinion it is necessary to first review the Court's findings and conclusions underlying the dismissals: The Debtors[1] are related – Christopher Stracener is Judy Garrard's son – and they shared a common creditor, Lowery Brothers Motors, Inc. ("Lowery"), a used car and truck dealer. Lowery filed motions seeking stay relief to repossess five vehicles the Debtors had committed to purchase on a cash basis.[2] After considering the evidence and arguments presented at the hearings on Lowery's motions, the Court found the Debtors had misled Lowery

---

[1] Mr. and Mrs. Garrard (the "Garrards") and Mr. Stracener ("Stracener") are collectively referred to as the "Debtors."

[2] The Garrards were to purchase two vehicles: a 2003 Chevrolet Silverado and a 2004 Lexus RX330. Stracener was to purchase three vehicles (one each for himself, his wife, and his 20-year-old daughter): a 2004 Ford F-150, a 2009 Nissan Cube, and a 2007 Jeep Compass. As discussed *infra*, all the money to purchase the five vehicles was to come from the Garrards. The commitments to purchase the vehicles from Lowery were made in early October 2012.

1

by representing that the Garrards were about to receive a large insurance settlement stemming from a recent fire loss, and the Debtors told Lowery that the Garrards would use the insurance monies to pay for the five vehicles – two for the Garrards and three for Stracener. Relying on the Debtors' assurances that receipt of the insurance proceeds was imminent, Lowery allowed them to take possession of the vehicles. In hindsight, that proved to be a mistake. Although the evidence was sketchy, apparently there was a fire of some sort; however, there was no insurance settlement, and the promised payments to Lowery were never made. The Debtors refused to return the vehicles; instead they filed chapter 13 cases to stop Lowery from regaining possession of the vehicles. The Court could not determine whether the Debtors' misrepresentations were intentional, but was inclined to believe they were made recklessly, without regard to the true state of affairs. Nonetheless, the Court concluded that neither of these cases had been filed in good faith, the Debtors' plans had not been proposed in good faith,[3] and more critical to the issues addressed in this opinion, the Debtors' incomes were not sufficient to support feasible plans. An order was entered (the "Dismissal Order") granting Lowery's motions, and the cases were dismissed.[4]

Now go back to the beginning of this episode: The Debtors' immediate goal in seeking bankruptcy protection was to invoke the automatic stay and stop Lowery from regaining possession of the vehicles they had acquired under dubious circumstances. Short term, they succeeded. But if they had any chance of long-term retention of the vehicles by way of chapter

---

[3] Among the other prerequisites to confirmation are "the plan has been proposed in good faith" and "the action of the debtor in filing the petition was in good faith." Code § 1325(a)(3),(7). References to the "Code" are to the Bankruptcy Code, 101 U.S.C. § 101 *et seq.*

[4] Lowery's motions asked for relief from the automatic stay and "such other, further, or different relief to which it might be entitled, and which [the] Court might deem appropriate." In the Dismissal Order, the Court concluded that the appropriate remedy was dismissal of the cases. The Dismissal Order set out more detailed findings and conclusions. Garrard Doc. 37 and Stracener Doc. 32.

13, their next step would have been to achieve confirmation of plans that provided for payment of the vehicles via monthly installments to the trustee. In light of the Debtors' limited incomes reported in their Schedules I, especially Stracener's,[5] their most significant obstacle to confirmation – other than the lack of good faith – was feasibility, i.e. demonstrating that the Debtors had the ability to make plan payments.[6]

In an effort to obscure the fact that the feasibility requirement for confirmation could not be satisfied, Stracener, acting with the overt or passive – it matters not – complicity of his attorney, fabricated a budget on his amended Schedule J (Doc. 22) to give the impression that his monthly net income was sufficient to pay the proposed plan payments over the duration of an already stretched term.[7] In a footnote at the end of the Dismissal Order, the Court criticized Stracener and his attorney for filing a concocted schedule in an attempt to demonstrate feasibility when there was none. That footnote read as follows:

> Compare Stracener's budget with that of the Garrards [i.e. compare Schedules J filed in each case]. Each month Stracener proposes to feed his family

---

[5] According to the HHS Poverty Guidelines for 2013, the federal poverty threshold for a 5-member family is $2,297.50 per month. Stracener's 5-member family income, as reported in his Schedule I (Doc. 1, p. 19), was $1,802.67.

[6] As a condition to plan confirmation, Code § 1325(a)(6) requires that "the debtor will be able to make all payments under the plan . . . ." Failure to achieve plan confirmation is grounds for dismissal. Code § 1308(c)(5).

[7] Stracener's original proposed plan (Doc. 9) had a term of 36 months, and called for monthly payments of $741.00. This payment was intended to pay for his three vehicles, his attorney's fees and filing fees, but nothing to unsecured creditors. His amended plan (Doc. 20) lengthened the term to 48 months, and decreased the monthly payments to $566.00. The Debtors in both these cases had below-median incomes, thus Code § 1322(d) restricted the term of their plans to 3 years, unless the court, *for cause*, approved a longer term, not to exceed 5 years. The only "cause" for exceeding the prescribed 3 years was to extend the time to pay for vehicles acquired under unsettling circumstances, and which the Debtors could ill afford. Considering these facts, there was no cause to extend the plans beyond 3 years.
It's worth noting that in Stracener's amended plan (Doc. 20), the sum of the monthly payments to Lowery for three vehicles was $579.90; however, that sum exceeded the total monthly payment proposed under the plan by $13.90. In addition to the payments to Lowery, the amended plan also should have provided for the payment of attorney and filing fees, thus the unexplained shortfall was substantially more than $13.90. This is yet another example of either the Debtors' attorney not tending to business or delegating a task to a non-lawyer employee and failing to review the employee's work product before the attorney's signature was affixed and the document filed with the Court.

3

of five for $30 each; Garrard $200 each. For three vehicles, Stracener states he anticipates paying each month $180 transportation expense and $80 for auto insurance; for two vehicles, the Garrards anticipate paying $450 and $200, respectively, for the same expenses. Somebody is just not telling the truth. What's even more disturbing is that the same attorney represents both families. Such manipulation might be expected – but not condoned – by laymen who don't understand the repercussions of signing court pleadings under penalty of perjury; there is no similar excuse for an attorney, especially one who regularly practices in bankruptcy courts.

For most below-median income cases, and the instant cases were not exceptions, a debtor's ability to make plan payments is largely determined from his income and expenses reflected on Schedules I and J.[8] Stracener's original Schedule J (Doc. 1, p. 20) stated that his family's food budget for each month was a paltry $200. He later amended Schedule J (Doc. 22, p.1), and reduced his family's monthly food expense to $150. In addition to himself, Stracener's family includes his wife and three children, ages 11, 15, and 20.[9] In other words, on an annualized basis, the food budget proposed on Stracener's amended Schedule J was less than $1.00 per day for each family member. Stracener and his attorney knew without question that the proffered food budget was not credible.[10] Chapter 13 debtors and their families may be expected to undergo financial belt-tightening, but not suffer starvation.

---

[8] "This Court holds that in determining whether a below median income debtor is offering all of his projected disposable income under a plan, the first step, and in most cases the last step, is to look at the debtor's Schedules I and J. If the Schedules are *accurately completed in good faith* and plan payments are substantially the same as the debtor's monthly net income shown on Schedule J, then the Court will conclude that the debtor is offering his projected disposable income under his plan as required by Section 1325(b)(1)(B)." *In re Dew,* 344 B.R. 655, 660-61 (Bankr. N.D. Ala. 2006) (emphasis added).

[9] Schedule I, Doc. 1, p. 19.

[10] Stracener's case was filed in March 2013. His attorney also filed in this Court case numbers 13-40401 and 13-40599 during the same month. Like Stracener's family, the families in these other two cases consisted of a husband, wife and three children. The monthly food expenses for these other two cases, as reported on their Schedules J, were $500 and $800, respectively.

## II: Attorney's Motion to Strike

The Debtors' attorney filed a motion to strike the offending footnote (Garrard Doc. 39, Stracener Doc. 34, and herein, the "Motion to Strike"). He complained that, "The footnote strongly insinuates that I, the attorney, manipulated these expenses." He continued by stating:

> . . . If I did not make it clear at the hearing on 26 April, allow me to do so at this time. ANY and ALL information contained in both petitions were [sic] provided by the debtors. . . . [emphasis in original]
>
> . . . Plans are prepared based on the information provided by the debtors and then reviewed with the client as to whether a plan may or may not be feasible and is only amended if said client can alter their life style to accommodate what is necessary to successfully complete a plan. . . .
>
> When clients are faced with loosing [sic] their home, vehicle and etc., I am sure they may over estimate themselves as to what they can successfully change in their lives in order to save their possessions, however I am not going to sit in judgment and state to them that they must spend x-amount of money on food or any other expense. Whether a budget is reasonable or not is a determination to be made by the trustee and above all the court. If the court determines that a budget is not feasible, then so be it, but that should have no bearing on the truthfulness of the attorney representing the debtors. . . .
>
> I take the court's analysis in these two cases as a direct and personal attack on my credibility. . . .[11]

Recall, the Court's criticism of the attorney was given short shrift in a footnote appearing at the end of the unpublished Dismissal Order. Addressing the merits of the Motion to Strike now requires a more thorough analysis of the issues raised by the attorney.

## III: Discussion

Although myopic, manipulating a debtor's budget to match his net income with plan payments is a practice that on occasion is resorted to in chapter 13 cases to give the false impression a debtor has the ability to pay secured claims. Usually those claims are secured by

---

[11] In the Motion to Strike, the attorney also stated that "At NO time in the twenty years I have been practicing in this Court have I ever manipulated information provided by clients." (emphasis in original).

5

cars and trucks the debtor cannot afford, can do without, or both. The unspoken objective for offering such unrealistic budgets is to justify retention of vehicles when they should be surrendered in full or partial satisfaction of the associated secured claims. Surrendering those vehicles may initially be unpopular and painful, but it removes the temptation to propose plan payments that in actuality are beyond a debtor's reach and, for a below-median debtor, helps to keep the plan's term at the 3 years intended by the Code.[12] Lower payments over a shorter period of time increase the chances of a successful chapter 13 case that will conclude with a discharge. Stracener's budget, as reflected in his amended Schedule J (Doc 22, p. 1) was the quintessence of this ill-conceived practice of proposing manipulated and unrealistic budgets to give the appearance of sufficient net income to pay secured claims, and is now particularly disturbing in light of the unique stance the Debtors' attorney has taken regarding his responsibilities to his clients and this Court with respect to the preparation of bankruptcy schedules.

While the Court believes the attorney's protests voiced in his Motion to Strike are sincere, his argument – he is duty-bound to blindly accept as accurate everything his client tells him, and leave it to the trustee and court to sort out the truth – is simply wrong. His ill-perceived role in preparing his clients' bankruptcy petitions and schedules is more akin to that of a petition preparer than a lawyer. A petition preparer is a mere scrivener, transferring proffered information to paper or a computer screen, and is prohibited by Code § 110(e)(2)(B)(vii) from advising a debtor "concerning bankruptcy procedures and rights." Giving advice to a prospective debtor may be off limits to a petition preparer, but it is required of an attorney. After all, the exercise of professional judgment while providing advice and counseling to one's client is the essence of

---

[12] Code § 1325(a)(5)(C) allows confirmation of a plan that provides for the surrender of collateral to the holder of a secured claim. With respect to the length of under-median debtors' plans, see n. 7, *supra*.

6

being a professional; that's the reason laymen seek out the services offered by professionals, whether they are lawyers, physicians, architects, public accountants, engineers, or members of the clergy. Rule 2.1 of the *Alabama Rules of Professional Conduct* refers to a lawyer as an "Advisor" and requires that he "shall exercise independent professional judgment and render candid advice." An attorney who represents a prospective debtor in a bankruptcy case is expected to take an active role and provide expert advice to his client with respect to completing the petition and related pleadings, including schedules.[13]

The notion that an attorney representing a debtor in a bankruptcy case must take everything his client says as accurate and truthful is a novel suggestion, and not supported by the Code or the Federal Rules of Bankruptcy Procedure.[14] Contrary to the attorney's description of his duties when preparing and filing bankruptcy pleadings, including schedules, he may not blithely rely on what he is told by his debtor-client; rather, as the following Code and Rule provisions mandate, further inquiry may be required:

> (a) A debt relief agency [including an attorney] shall not—
>
> \* \* \* \*
>
> (2) make any statement, or counsel or advise any assisted person or prospective assisted person to make a statement in a document filed in a case or proceeding under this title, that is untrue or misleading, or that upon the *exercise of reasonable care*, should have been known by such agency to be untrue or misleading.

Code § 526(a)(2) (emphasis added).

> (C) The signature of an attorney on a petition, pleading, or written motion shall constitute a certification that the attorney has—

---

[13] Rule 2016-1(l) of the local rules of this Court requires a chapter 13 attorney who agrees to accept the "no-look" fee – as the attorney did in these cases – to "perform all required and necessary services for the debtor including, but not limited to, (A) *Counseling* with the debtor [and] (B) Preparing and filing the chapter 13 petition and other documents. . . ." [emphasis added].

[14] Collectively referred to as the "Rules" and Individually as a "Rule," unless the context indicates otherwise.

7

> (i) performed a *reasonable investigation* into the circumstances that gave rise to the petition, pleading, or written motion; and
> (ii) determined that the petition, pleading, or written motion—
>
> > (I) *is well grounded in fact* . . . .
>
> (D) The signature of an attorney on the petition shall constitute a certification that the attorney has no knowledge *after an inquiry* that the information in the schedules filed with such petition is incorrect . . . .

Code § 707(b)(4)(C), (D) (emphasis added).

And in the same vein, Rule 9011 provides that:

> (b) *Representations to the Court.* By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the [attorney's] knowledge, information, and belief, formed after an *inquiry reasonable under the circumstances*, –
>
> > (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation [and] . . .
> >
> > (3) the allegations and other factual contentions have *evidentiary support* . . . .

Rule 9011(b) (emphasis added).

And how exactly should an attorney fulfill his duty to make a reasonable inquiry into the truthfulness and accuracy of factual matters his client wishes to advocate in a bankruptcy case? The answer to that question was succinctly expressed in *In re Thomas*, 337 B.R. 879 (Bankr. S.D. Texas 2006), *aff'd* 223 Fed. Appx. 310 (5th Cir. 2007), where the bankruptcy court adopted the following description of an attorney's duty of reasonable inquiry:

> The duty of reasonable inquiry imposed upon an attorney requires the attorney (1) to explain the requirement of full, complete, accurate, and honest disclosure of all information required of a debtor; (2) to ask probing and pertinent questions designed to elicit full, complete, accurate, and honest disclosure of all information required of a debtor; (3) to check the debtor's responses in the petition and Schedules to assure they are internally and externally consistent; (4) to demand of

Case 13-40418-JJR13    Doc 51    Filed 08/05/13    Entered 08/05/13 15:50:45    Desc Main
Document    Page 8 of 15

the debtor full, complete, accurate, and honest disclosure of all information required before the attorney signs and files the petition; and (5) to seek relief from the court in the event that the attorney learns that he or she may have been misled by a debtor . . . .

337 B.R. at 892 (quoting *In re Henry Lubaczewski*, case no. 98-19398 (Bankr. D.N.J.)).[15] The *Thomas* court stated that it "could not state the rule better" and this Court whole-heartedly agrees.[16] If the Garrards' and Stracener's attorney had fulfilled his duty of reasonable inquiry as described in *Lubaczewski* and adopted by the *Thomas* court, the footnote of which the attorney now complains and wants stricken, would never have been written.[17]

The Debtors' attorney would exonerate himself from any responsibility by shifting the blame to his client who, according to the attorney, furnished the inaccurate information in the first place: "ANY and ALL information contained in both petitions were [sic] provided by the debtors."[18] The Court is skeptical that Stracener was the exclusive source of the misinformation, but even if he were, that would not excuse the attorney's failure to inquire further about objectively implausible information his client proposed for Schedule J.[19] An attorney's duty to

---

[15] According to the *Thomas* court, the unpublished *Lubaczewski* decision "had some notoriety in the press. *The New Jersey Law Journal*, Law.com, and the American Bankruptcy Institute have published reports. *The New Jersey Law Journal* lead sentence reads: 'The ethics prosecution of one of New Jersey's busiest bankruptcy lawyers . . . raises the question of whether it's common practice—or used to be—for bankruptcy lawyers to be less than candid in Chapter 13 petitions.'" 337 B.R. at 892 n. 49.

[16] 337 B.R. at 893.

[17] In the Disclosures of Compensation required by Code § 329(a) and Rule 2016(b), signed and filed by the attorney in the Debtors' cases, he certified that "In return for the . . . fee, I have agreed to render legal service for all aspects of the bankruptcy case, including . . . *Analysis* of the debtor's financial situation . . . [and] Preparation and filing of any . . . *schedules* . . . . [emphasis added]. Garrard Doc. 1, p. 34; Stracener Doc. 1, p. 31.

[18] Motion to Strike (emphasis in original).

[19] As discussed *supra*, Stracener's Schedule J was amended to reduce his five-member family's monthly food budget from $200 to $150. The only conceivable reason for the amendment was an attempt to demonstrate feasibility, when there was none. The Court will not accept as true the suggestion that Stracener, without his attorney's input, independently came up with a scheme to beef-up his net income by reducing his family's food

9

his client must defer to the standards and limitations imposed by the Code and Rules.[20] Or as stated by the *Thomas* court, "counsel's duty of candor to the court overrides counsel's duty of vigorous advocacy."[21]

For the lion's share of information needed to complete chapter 13 petitions, schedules, and related documents, an attorney may usually rely on his client's representations without further investigation, provided those representations appear reasonable and credible on their face. For example, as a general rule no further investigation is required to confirm a debtor's representations regarding his residence, place of employment, dependents, assets, income and expenses, *except* where the tendered information is outside the norm, on its face lacks credibility, or the attorney has independent contradictory information. But at a minimum, and critical in these cases, before an attorney may accept his client's representations as truthful and worthy of the attorney's signature, they must be plausible; and Stracener's food budget was simply not believable under any circumstances.[22]

---

budget to an even more improbable amount – $200 down to $150. Either the attorney was responsible for preparing the schedules with those figures, or equally egregious, he delegated the task to a non-lawyer staff member and then neither counseled his client nor reviewed his staff's imprudent work-product before it was filed.

[20] **False Evidence** . . . . When false evidence is offered by the client, however, a conflict may arise between the lawyer's duty to keep the client's revelation confidential and the duty of candor to the court. Upon ascertaining that material evidence is false, the lawyer should seek to persuade the client that the evidence should not be offered or, if it has been offered, that its false character should immediately be disclosed. If the persuasion is ineffective, the lawyer must take reasonable remedial measures. . . .
**Refusing to Offer Proof Believed to Be False** Generally speaking, a lawyer has authority to refuse to offer testimony or other proof that the lawyer believes is untrustworthy. Offering such proof may reflect adversely on the lawyer's ability to discriminate in the quality of evidence and thus impair the lawyer's effectiveness as an advocate. . . .
*Alabama Rules of Professional Conduct*, rule 3.3 "Candor Toward the Tribunal" comments.

[21] 337 B.R. at 893 (italics and capitalization omitted).

[22] Bankruptcy schedules are not unlike factual averments in a civil complaint: they both express facts that support the underlying court proceeding. Thus, standards established by the Supreme Court for pleading facts are instructive: "[A] complaint must . . . state a claim to relief that is *plausible* on its face. . . . Determining whether a

Ignoring the Code and Rules was not inconsequential. As a result of the Debtors' cases being filed, Lowery was forced to hire a lawyer, pay filing fees for the stay-relief motions, and wrongfully denied possession of five vehicles while they depreciated and were being driven by the Debtors. Although they were not innocent bystanders, these cases had negative repercussions for the Debtors. Instead of taking a hands-off approach, their attorney should have provided professional advice and counseling that would have helped the Debtors realize that chapter 13 was not the answer to their dilemma – they simply could not afford the vehicles. They incurred filing fees for their bankruptcy cases, and perhaps paid fees to their attorney – *perhaps* because the Statements of Attorney (Garrard Doc. 3; Stracener Doc. 2) represented no fees were collected prepetition, but the plans as well as the disclosures of compensation filed with the petitions (Garrard Doc. 1, p. 34; Stracener Doc. 1, p. 31) stated otherwise.[23] And the Debtors' credit reports will now reflect unsuccessful bankruptcy cases, which will likely result in their having difficulty obtaining future credit, and even if they find a willing lender their cost of credit will likely be substantially more.

The harm goes beyond the immediate parties in interest. The credibility of bankruptcy jurisprudence, including its courts, judges, trustees and lawyers, is diluted with each fallacious

---

complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and *common sense.*" *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (emphasis added; citations and internal quotation marks omitted). Common sense dictated Stracener's proposed budget was simply not plausible. A civil complaint alleging such nonsense would be subject to dismissal for failure to state a claim for relief.

[23] The conflict between the attorney's certifications and the plans regarding payment of prepetition fees is further evidence of the attorney's failure to review what was filed with the Court over his signature. In light of the matters discussed in this opinion, and the conflicting information regarding payment of prepetition fees in the plans and the attorney's certifications, the Court will issue a separate order requiring the attorney to show cause why fees, if any, he collected from the Debtors should not be refunded and why he should not be required to reimburse the Debtors for any filing fees they paid.

case like these.[24]  It also increases the public's skepticism of legitimate debtors who are deserving of debt relief.  And the contagion growing from this type of misuse has been criticized by other courts:

> When one or more attorneys allow one or more clients to abuse the system, the harm which devolves is not limited to the affected creditors.  By example and word of mouth, the "technique" spreads until it is no longer perceived by the Bar and by debtors as an abuse but as a permissible manipulation of the system.  In the meantime, respect for the bankruptcy system, including attorneys who wish to assist honest debtors, deteriorates.  When public respect for any part of the legal system falters, it harms everyone involved in the system, which must rely on honest participation.

*In re Thomas*, 337 B.R. at 892-93 (quoting *Lubaczewski*, supra).
.
> Bad-faith bankruptcy filings significantly burden the legal system in general and bankruptcy courts in particular. . . .Considering bankruptcy courts may sanction litigants for *filing documents with any improper purpose* . . . as well as take any action . . . necessary or appropriate . . . to prevent an abuse of process, . . . we see no reason why prepetition bad faith should not constitute an adequate or sufficient reason for dismissal.  To hold otherwise would create the appearance that such an abusive practice is implicitly condoned by the [Bankruptcy] Code.

*Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, --- F.3d ---, 2013 WL 3198005, *4 (11th Cir. 2013) (emphasis added; internal quotation marks and citations omitted).

Statistics are telling and troubling.  From January through the first week in July 2013, a total of 431 chapter 13 cases came before this Court (Eastern Division of the Northern District of Alabama) for plan confirmation; in 275 of those cases the debtors (almost 64%) had filed previous cases, most of which were failed chapter 13's.  Sixty-three debtors had filed three or more prior cases.  In this Court, and apparently nationwide, approximately 2 out of 3 chapter 13

---

[24] Unfortunately, the two instant cases are not isolated examples of this type of abuse in this Court. Other attorneys have admitted as much when they were challenged to substantiate their client's proposed budgets. One seasoned bankruptcy lawyer volunteered that different amounts were used in completing Schedules I and J, depending on whether his clients were seeking relief under chapter 7 or chapter 13, and was incredulous when the Court was critical of his tactic.  "Bankruptcy Schedules are mandatory statements by debtors made under penalty of perjury and apply to all cases. . . . [A} debtor's obligation to file truthful schedules is the same under chapters 7, 11 and 13." *In re Thomas*, 337 B.R. at 883, n. 13.

Case 13-40418-JJR13    Doc 51    Filed 08/05/13    Entered 08/05/13 15:50:45    Desc Main
Document      Page 12 of 15

cases fail and are dismissed without a discharge.[25] The Court is confident that many of these failed cases were doomed from the start because the debtors, with their attorneys' assistance or acquiescence, "backed into" their budgets: first determining how much was needed to cover plan payments and then plugging in unrealistic amounts on Schedule J to give the false appearance that the plan was feasible.[26] Such cases usually conclude, not with a discharge and financial fresh start, but with an early default and dismissal, followed by another serial filing. Often the only one paid in these ill-fated cases before they are dismissed is the attorney.

IV: Summary and Conclusion

Before filing his client's bankruptcy schedules an attorney is required to determine that their content is well grounded in fact, and his signature on the petition serves as a certification that he has no knowledge *after an inquiry reasonable under the circumstances* that the information contained in the schedules is other than true and accurate. The failure by the Debtors' attorney in these cases to inquire into the objectively implausible budget contained in Stracener's Schedule J constituted a failure to abide by the requisites of the Code and the Rules, and was the basis for the footnote in the Dismissal Order of which he now protests. If he had made the proper inquiry he would have concluded the proposed budget was beyond the pale, and

---

[25] Tara Siegel Bernard, *Blacks Face Bias in Bankruptcy, Study Suggests*, N.Y. TIMES, Jan. 21, 2013, at A1, made the point:
> ". . . . Nearly two of every three Chapter 13 plans are not completed, which means the filers' remaining debts are not discharged, leaving them right where they started. One bankruptcy judge, who sees filers once they can no longer make the required payments in the plans, said the debtors usually do not have enough income to stick with the budget. 'They thought they could cut back on this or that, and you might be able to do that for three or four months,' said the judge, C. Ray Mullins, chief judge for the United States Bankruptcy Court in the Northern District of Georgia. 'But in a Chapter 13, it will be either three or five years. There are certain things you can't anticipate — a spike in gas prices.' . . . "

[26] Stracener's case epitomizes this tactic. The monthly payment proposed on Stracener's original plan (Doc. 9) and his monthly net income shown in his original Schedule J (Doc. 1 p. 20) were $741.00 and $741.70, respectively. Stracener amended both his plan (Doc. 20) and Schedule J (Doc. 22) at the same time. As amended, the plan payment became $566.00 and the monthly net income became $566.70.

13

advised Stracener that feasibility was insurmountable, plan confirmation improbable, and the case should not be filed.[27] Moreover, the Court concludes that the schedule was filed for the purpose of misleading the Court, creditors, and the trustee by giving the false impression that a chapter 13 plan was feasible and could eventually qualify for confirmation. As stated by the court in *In re Kilker*, 155 B.R. 201, 204 (Bankr. W.D. Ark. 1993), "The blatant and fraudulent manipulation of information on the schedules to obtain a particular result is an unfair and insidious abuse of the bankruptcy process." Admittedly, the misconduct of the Debtors' attorney was not as egregious as that described in the cases cited in this opinion, and his failings probably stemmed from a lemmingistic approach to law practice – everyone does it – that was antagonistic to the very essence of professionalism. There also was evidence of too little, or absolutely no oversight of non-lawyer employees. Regardless, the attorney's handling of these cases, especially Stracener's, was unprofessional and cannot be ignored, particularly in light of the attorney's erroneous assessment of his duties, and their priorities, owing to his clients and the Court.[28]

---

[27] Pleading standards aside, these cases should never have been filed in the first place. Chapter 13 was not a viable solution to the Debtors' self-inflicted financial wounds. All parties, including the Debtors, admitted the sale of the vehicles was intended to be a cash transaction. The Debtors' failure to return the vehicles to Lowery after the insurance proceeds failed to materialize smacked of bad faith. What's more, it was readily apparent the Debtors could not afford to pay for the vehicles even if their proposed plans were confirmed. Putting the Debtors in chapter 13 cases under these circumstances was setting them up for certain failure.

[28] This Court takes no pleasure in writing opinions about attorney misconduct or incompetence, whichever it was in these cases. This Court shares the sentiments of Judge Burns expressed in *Lubaczewski*, *supra*: "And I agonized over this, too because there is nothing that the Court likes less than to have to deal with an attorneys' unprofessional conduct . . . ." *Thomas,* 337 B.R. at 892.

Accordingly, for the reasons stated above, an order will be entered this date denying the Motion to Strike.[29]

So done and dated this 5th day of August 2013.

/s/ James J. Robinson
JAMES J. ROBINSON
U.S. Bankruptcy Judge

---

[29] Issues related to the Debtors' payment of prepetition attorney fees and filing fees, and whether they should be reimbursed by their attorney, will be addressed at the show-cause hearing to be set as mentioned in note 23, *supra*.